**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JOSE TURCIO,                            :
                                        :    Civil Action No. 09-3531 (FLW)
                    Petitioner,         :
                                        :
            v.                          :    **OPINION**
                                        :
MICHELLE RICCI, et al.,                 :
                                        :
                    Respondents.        :


**APPEARANCES:**

Petitioner pro se                Counsel for Respondents
Jose Turcio                      Simon Louis Rosenbach
New Jersey State Prison          Middlesex Co. Pros. Ofc.
P.O. Box 861                     25 Kirkpatrick Street
Trenton, NJ  08625               3rd Floor
                                 New Brunswick, NJ 08901


**WOLFSON**, District Judge

    Petitioner Jose Turcio, a prisoner currently confined at New

Jersey State Prison in Trenton, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The respondents are Warden Michelle Ricci and the

Attorney General of the State of New Jersey.

    For the reasons stated herein, the Petition must be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> The facts elicited at trial demonstrate the following.  On February 14, 1998, at approximately 9:15 p.m., defendant and an unidentified person entered Bodnar's liquor store in New Brunswick armed with handguns, demanding money.  Defendant, the smaller of the two, carried a silver revolver while the unidentified perpetrator had a black automatic.  The owner, John Bodnar, and employees Charles Mack, Joseph Maselli, and Peter Russo, were working at the store that evening.  Also present was Bodnar's friend, Nick Steiner.  Defendant approached Steiner and either struck him on the head or pushed him off the chair.  Bodnar heard the commotion from his office and saw someone with a gun.  He called 911 and retrieved his gun from his desk, at which time defendant partially entered the office and pointed his gun at Bodnar.  Bodnar's gun jammed and defendant began firing, hitting Bodnar's computer.  Bodnar unjammed his gun and returned fire.  As defendant was backing out of Bodnar's office, Mack heard a couple more gunshots and saw Russo fall to the floor.  Russo ultimately died from his gunshot wounds.

> After the police arrived, Mack, Maselli, and Bodnar met with a composite artist.  Mack and Maselli provided information concerning the man with the silver revolver while Bodnar supplied information about the other perpetrator.  Bodnar, whose attention was fixed upon the intruder's gun, only had a split second to see defendant's face.  He was unable to identify defendant but described the person with the black automatic.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

2

Later, however, Bodnar was unable to identify the other perpetrator.

On December 8, 1998, Detective John Selesky of the New Brunswick Police Department presented Maselli with a photographic array. Maselli was eighty-percent certain that defendant was the person with the silver revolver. Later that month both Maselli and Mack viewed a lineup separately and identified defendant as the man with the silver revolver. They also identified defendant at trial.

Jose Mena, called as a witness by defendant, testified that he drove the get-away car but was unaware that a crime was in progress. According to Mena, defendant was not one of the two men in the car that he drove to Bodnar's liquor store. He claimed that he did not know defendant at the time but did drive a man named Jose who he knew from a construction job, had met socially, and lived in Somerset. Mena did not know nor could he identify the second man. On cross-examination Mena acknowledged that he lived at 113 Howard Street in New Brunswick, approximately three blocks from Bodnar's liquor store. He denied knowing that defendant's girlfriend also lived at 113 Howard Street.

Braceldina Delcid, defendant's sister, testified that on the night of the robbery defendant attended a Saint Valentine's Day party in Westbury, New York, with approximately ten to twelve other people. According to Delcid, defendant left the party between 9:30 and 10:00 p.m. with Julio Ramirez. Julio Ramirez also testified that he was with defendant at the Westbury party and they left the party together at 10:00 p.m. and returned home.

In rebuttal, the State presented testimony from Detective Selesky, who interviewed defendant on November 24, 1998, at which time defendant stated that his girlfriend lived at 113 Howard Street and that he knew Jose Mena with whom he worked at J.C. Construction. Selesky also testified that defendant was able to identify a photograph of Mena as a person with whom he worked.

(Opinion of Appellate Division, Sept. 30, 2003, at 3-5.)

3

B.    Procedural History

     On February 24, 1999, a Middlesex County grand jury returned
an indictment charging Petitioner, co-defendant Jose Mena, and an
unknown person with murder, armed robbery, and related offenses.

     Petitioner's pre-trial motion to suppress evidence of out-
of-court photographic and line-up identifications was denied.  At
the end of a six day trial, a jury found Petitioner guilty of
first-degree murder of Peter Russo, N.J.S.A. 2C:11-3a(3), first-
degree attempted murder of John Bodnar, N.J.S.A. 2C:5-1 and
N.J.S.A. 2C:11-3a(1), first-degree armed robbery, N.J.S.A. 2C:15-
1, and second-degree possession of a weapon for unlawful
purposes, N.J.S.A. 2C:39-4a.  Following appropriate mergers, the
trial judge sentenced Petitioner to life imprisonment, subject to
a 30-year period of parole ineligibility, on the murder
conviction, and a consecutive fifteen-year term, with an 85
percent period of parole ineligibility, pursuant to the No Early
Release Act, N.J.S.A. 2C:43-7.2, on the attempted murder
conviction.

     Petitioner timely appealed and, on September 30, 2003, the
Superior Court of New Jersey, Appellate Division, affirmed.  On
January 24, 2004, the Supreme Court of New Jersey denied
certification.  State v. Turcio, 178 N.J. 454 (2004).

     Petitioner then timely filed a state petition for post-
conviction relief.  The trial court denied relief by order

4

entered on April 10, 2006.  On August 4, 2008, the Appellate Division affirmed the denial of relief.  State v. Turcio, 2008 WL 2952030 (N.J.Super. App.Div. Aug. 4, 2008).  The Supreme Court of New Jersey denied certification on January 22, 2009.  State v. Turcio, 197 N.J. 477 (2009).  This Petition timely followed.

Here, Petitioner challenges his conviction on the following grounds:  (1) it was error to deny the defense request to present the prior consistent statement of Jose Mena as related by Sheriff's Officer Melendez, (2) because there was insufficient evidence to support a finding of guilt beyond a reasonable doubt it was error for the trial court to deny Petitioner's motion for a judgment of acquittal, (3) the eyewitness testimony was hopelessly tainted and although a cross racial identification instruction was given to the jury the court itself failed to take that into consideration when allowing the tainted identification testimony to be admitted, (4) under the test developed in Strickland/Fritz, Petitioner was denied effective assistance of counsel.

Respondents have answered,[2] and Petitioner has filed a Traverse in support of his Petition.  This matter is now ready for decision.

---

[2] Respondents assert that one claim was not exhausted in state court and that the Petition should, therefore, be dismissed as a mixed petition.  See 28 U.S.C. § 2254(b)(1)(A).  Because of the disposition of this matter, this Court need not address the exhaustion issue.  See 28 U.S.C. § 2254(b)(2).

II.   <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent

part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.
>
> With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determinated by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,

for the Court, Part II).  A state court decision "involve[s] an

6

unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL

7

1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);

8

United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),

cert. denied, 399 U.S. 912 (1970).

### III.   ANALYSIS

A.   Prior Consistent Statement

Petitioner asserts that it was error to deny the defense
request to present the prior consistent statement of Jose Mena,
that Petitioner was not the person he drove to the liquor store,
as overheard by Officer Melendez.

The Appellate Division rejected this argument on direct
appeal.

> ... Following the testimony of the State's
> rebuttal witness, defendant sought to call Sheriff's
> Officer Melvin Melendez.  Defense counsel represented
> that Melendez, who was assigned to the court in
> December 1999, when both Mena and defendant appeared,
> advised counsel that he had overheard Mena tell another
> prisoner in Spanish that defendant was not the guy.
> The judge sustained the State's objection, finding that
> the statement sought to be admitted was hearsay and not
> admissible under N.J.R.E. 803(a)(2).  The judge
> reasoned:
>
>> Now the rules governing prior consistent
>> statements are fairly clear and that is that prior
>> consistent statements of witnesses may only be
>> admitted to rebut an express or implied charge of
>> recent fabrication or improper influence or
>> motive. . . .  This is a case where Mr. Mena has
>> consistently from the beginning taken the position
>> that Mr. Turcio is not the same Jose that he drove
>> to the liquor store and that this defendant was
>> not involved in the holdup and the murder at
>> Bodnar's liquor store in February of 1998.  The
>> cross examination of Mr. Mena did not in any way
>> suggest a recent fabrication, nor did it suggest a
>> recent motive or improper influence.  It suggested
>> that from the outset his failure to identify Mr.
>> Turcio from the first time that he looked at the

9

photos was shortly after the crime was committed
after the arrests were made. . . .  If this court
were to interpret the rule as you were to suggest
. . . and that would mean that any witness prior
to trial could give numerous consistent statements
and that those statements could be used to bolster
the witness's testimony after cross examination
and I don't think that is what the rule allows
for.  Obviously, such statements would be very,
very unreliable.  here the statement was allegedly
made in the presence of a sheriff's officer at an
earlier proceeding in this very trial.  Now, for
this court to consider that to be reliable again
would allow for pretextual statements to be made
all the time in criminal proceedings where Mr.
Mena was here in court, he knew full-well that one
of the issues that would be addressed was his
identification of the co-defendant Mr. Turcio and,
in fact, that he may have stated in these
proceedings either under oath in the presence of
the court or in the presence of the sheriff's
officer really makes no difference.  The fact is
that clearly those circumstances do not in any way
give rise to inferential reliability.  They don't
satisfy the exception to the hearsay rule and,
therefore, I'm not going to permit the testimony.

N.J.R.E. 803(a)(2) provides in pertinent part that a
prior statement is not excluded by the hearsay rule if
it is:

> A statement previously made by a person who is a
> witness at a trial or hearing, provided it would
> have been admissible if made by the declarant
> while testifying and the statement:
>     ...
> (2) is consistent with the witness' testimony and
> is offered to rebut an express or implied charge
> against the witness of recent fabrication or
> improper influence or motive.

N.J.R.E. 607, which applies to evidence introduced to
impair or support the credibility of a witness,
correspondingly provides that "[a] prior consistent
statement shall not be admitted to support the
credibility of a witness except to rebut an express or
implied charge against the witness of recent
fabrication or of improper influence or motive and

except as otherwise provided by the law of evidence."[fn1]

> [fn1] The Comment to N.J.R.E. 607 states that "[e]xcept for fresh complaint evidence, prior consistent statements offered to bolster the credibility of a witness may only be admitted if the requirements of N.J.R.E. 607 are satisfied, i.e., that there has been a charge or suggestion that the testimony of the witness was a fabrication that was belatedly conjured up." Current N.J. Rules of Evidence, comment 4 on N.J.R.E. 607 (2003).

> Defendant's contention that the judge failed to read N.J.R.E. 607 in pari material with N.J.R.E. 803(2)(a) simply lacks merit. Likewise without merit is defendant's contention that the failure to permit Officer Melendez to testify represented plain error because it had a clear capability of producing an unjust result. The judge properly applied the applicable rules of evidence.

(Opinion of Appellate Division, Sept. 30, 2003, at 6-8.)

Respondents assert here that this claim fails to state a claim for federal habeas relief, as this is a claim peculiarly of state, not federal, law. Respondents correctly point out that Petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process. Estelle v. McGuire, 502 U.S. 62, 67-70 (1991).

Contrary to Respondents' characterization, however, Petitioner exhausted in state court, and asserts here, his federal constitutional claim that the refusal to permit Officer Melendez to testify deprived him of his right to present witnesses in his defense.

11

"'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" <u>Holmes v. South Carolina</u>, 126 S.Ct. 1727, 1731 (2006) (quoting <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998); also citing <u>Crane v. Kentucky</u>, 476 U.S. 683, 689-690 (1986); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438, n. 6 (1983); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302-303 (1973); <u>Spencer v. Texas</u>, 385 U.S. 554, 564 (1967)).

> This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" <u>Crane</u>, <u>supra</u>, at 690, 106 S.Ct. 2142 (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); citations omitted). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" <u>Scheffer</u>, <u>supra</u>, at 308, 118 S.Ct. 1261 (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 58, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).
>
> ...
>
> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. ... Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" <u>Crane</u>, <u>supra</u>, at 689-690, 106 S.Ct. 2142 (quoting

12

<u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); ellipsis and brackets in original).  <u>See also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

<u>Holmes v. South Carolina</u>, 126 S.Ct. at 1731-33 (citations omitted).

     Violations of the right to present a defense are subject to harmless error review.  <u>See</u>, <u>e.g.</u>, <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 680-84 (1986); <u>Savage v. District Attorney of the County of Philadelphia</u>, 116 Fed.Appx. 332 (3d Cir. 2004) (unpubl.).

     The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge. [footnote] ...

     But the right is not absolute.  The Sixth Amendment requires more than a mere showing by the accused that some relevant evidence was excluded from his trial.  Rather, the accused must show how that testimony would have been both <u>material</u> and <u>favorable</u> to his defense. ... [E]vidence is material: "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." ...  In [<u>United States v. </u>]<u>Bagley</u>, [473 U.S. 667 (1985), ]the Court further refined the materiality definition by noting that, "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383.

     In sum, for [a defendant] to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have

13

been material and favorable to his defense; and third,
that the deprivation was arbitrary or disproportionate
to any legitimate evidentiary or procedural purpose.
Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704,
2711, 97 L.Ed.2d 37 (1987).

Government of the Virgin Islands v. Mills, 956 F.2d 443, 445-46

(3d Cir. 1992) (footnote omitted).  The Court of Appeals noted

that some courts analyze such claims under the Due Process Clause

and that there is little, if any, difference in the analysis.

Mills, 956 F.2d at 445 n.4.

    Here, although apparently analyzing the issue under state

law, the Appellate Division held that the exclusion of the

proffered testimony did not have the clear capacity to produce an

unjust result.  This Court agrees that the excluded testimony was

cumulative and not material.  Nor was the judge's decision to

exclude the testimony arbitrary or disproportionate to legitimate

evidentiary and procedural purposes, as summarized by the trial

judge.  Petitioner is not entitled to relief on this claim.

B.  Sufficiency of the Evidence

    Petitioner contends that there was not sufficient evidence

to sustain his conviction, where the eyewitness was only 80

percent sure that Petitioner was the perpetrator.

    The Appellate Division rejected this claim on direct appeal.

        Defendant next contends that the judge erred in
    denying his motion to acquit following the presentation
    of evidence.  Denying defendant's motion the judge
    observed:

14

During the course of that investigation Mr.
Mack and Mr. Maselli both gave descriptions of the
men in question and I find those descriptions to
be consistent, not only with each other but
consistent with the description of the defendant
in this case.  Yes, there were minor, minor
inconsistencies with respect to the descriptions
but that is understandable given the circumstances
of the crime.  In any event, in addition to the
descriptions, they were able to describe this man
with a silver revolver to an artist who did a
composite photo ... and that was subsequently used
in the investigation after months of police
investigation and showing many photographs that
the police obtained from these witnesses and Mr.
Bodnar, ultimately, a photograph or a photo array
containing the photograph of Mr. Turcio was shown
to Mr. Maselli.  He identified that photograph as
someone who looked very similar to ... the man
with the silver gun.  Indeed, he said he was 80
percent sure that that photograph identified the
man with the silver gun.  Thereafter, a lineup was
conducted and the circumstances that the court
found to be admissible and both Mr. Maselli and
Mr. Mack positively identified the defendant Jose
Turcio as the perpetrator of the armed robbery
with the silver gun.  Thereafter, in these
proceedings both Mr. Maselli and Mr. Mack
positively identified Jose Turcio here in court
again as the man with the silver gun and one of
the perpetrators of the robbery.  The
identification of Mr. Turcio as one of the
perpetrators of this robbery and murder was, in
fact, corroborated by the testimony of Mr. Jose
Mena.  While it is true Mr. Mena took the stand
and indicated that it was not the same Jose that
he had driven to the liquor store on the date in
question, his testimony the court finds again
drawing the inferences most favorable to the State
the court finds his testimony to actually
corroborate the State's case, if you will, because
Mr. Mena testified that on the day in question he
drove to the liquor store, that he later concluded
were the perpetrators of the holdup and the murder
and one of those men was a Hispanic male named
Jose, someone that he had worked with previously.
Someone from the same country and fitting the same
general description as the defendant Jose Turcio,

15

although, he failed to identify Jose Turcio as the same individual nearly of important characteristic of this Jose is precisely the same and fits the characteristics and the description of Jose Turcio. And I think a jury could easily conclude if it chooses to which it has a right to do that Mr. Mena was telling the truth about the fact that he drove this Jose to the store, that all of these characteristics fit Jose Turcio but at this point he refused to identify Jose Turcio.

With respect to the alibi, the alibi testimony is obviously a matter of credibility for this jury to decide. If the alibi testimony is believed to be true, then obviously this jury would conclude that Mr. Turcio was not at the scene of the crime and could not have been one of the perpetrators. But that is clearly not for this court to decide. Again at this stage of the proceeding the court must look at the testimony in its most favorable light and obviously the jury could easily conclude that this alibi was not accurate. Either that it was fabricated or that it comes so long after the fact of the crime that is several, many months testimony being that the alibi could not have reported or was not reported until at least ... December of 1998 or January of 1999 which, of course, is several months after the murder and holdup. The jury could easily choose to reject that alibi testimony and, therefore, find the defendant guilty of the charges. ... So for those reasons ... your application for a judgment of acquittal is denied and the court feels that this matter must be referred to the jury.

The "broad test" for determination of a motion to acquit "is whether the evidence at that point is sufficient to warrant a conviction of the charge involved." State v. Reyes, 50 N.J.454, 458 (1967). Specifically, the appellate court is constrained to sustain a trial judge's denial of a R. 3:18-1 motion to acquit at the close of the State's case if, "'viewing the State's evidence in its entirety, be that evidence direct or circumstantial,'" and giving the State the benefit of all reasonable inferences, "'a reasonable jury could find guilt of the charge beyond a reasonable doubt.'" State v. Josephs, 174 N.J. 44, 80 (2002)

16

(quoting <u>Reves</u>, <u>supra</u>, 50 N.J. at 458).  Applying this
standard, the judge properly denied defendant's motion.

Defendant points to the presence of alibi evidence
together with Mena's testimony that defendant was not
the Jose in the car and certain inconsistencies in the
descriptions initially given by Mack and Maselli
concerning the height and build of the perpetrators and
whether they had moustaches.  He argues that the
State's failure to (1) identify defendant, (2) rebut
defendant's alibi and (3) prove that defendant was the
person in Mena's car when it arrived at the liquor
store entitled him to an acquittal.  Again we disagree.
As the judge observed, defendant was positively
identified by both Mack and Maselli and there was
evidence questioning Mena's credibility respecting
defendant.  We agree with the judge's analysis and are
satisfied that, when the evidence is viewed in a light
most favorable to the State and the State is given the
benefit of all reasonable inferences, a reasonable jury
could find defendant guilty beyond a reasonable doubt.

(Opinion of Appellate Division, Sept. 30, 2003, at 8-12.)

A claim that the jury's verdict was against the weight of

the evidence raises a due process concern.  Only where, "after

viewing the evidence in the light most favorable to the

prosecution, [no] rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt" should

the writ issue.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

This standard must be applied "with explicit reference to the

elements of the criminal offense as defined by state law."

<u>Jackson</u>, 443 U.S. at 324, n.16.  <u>See also</u> <u>Orban v. Vaughn</u>, 123

F.3d 727 (3d Cir. 1997), <u>cert. denied</u>, 522 U.S. 1059 (1998).  As

noted above, state court factual determinations are presumed to

be correct.  See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir. 2000).

Here, Petitioner's only challenge to the sufficiency of the evidence is to the identification of him as the perpetrator with the silver gun.  The state court applied the correct standard to determine the sufficiency of the evidence, and the state court's determination that the identification evidence was sufficient to sustain a conviction is neither contrary to nor an unreasonable application of controlling federal law.  Nor is the state court's factual determination unreasonable in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

C.   Identification Testimony

Petitioner contends that the photographic identification is unreliable because Mr. Maselli viewed hundreds of photographs over a period of months.  He contends that the line-up identification was tainted by Mr. Maselli viewing Petitioner in court, on an unrelated matter, prior to identifying him in a lineup.  Finally, Petitioner contends that the trial court should have considered cross-racial identification factors in determining the admissibility of the various identifications.

The Appellate Division rejected most aspects of this claim on direct appeal.[3]

_____

[3] The claim that Mr. Maselli's identification was tainted by seeing Petitioner in court on an unrelated matter was raised only in Petitioner's petition for post-conviction relief.

18

Repeating in Point III the same arguments asserted in Point II, defendant contends that the eyewitness testimony of Mack and Maselli was "hopelessly tainted" and the judge's decision to admit their out-of-court identification was error.  When evaluating the admissibility of an out-of-court identification, the court employs a two-part test.  State v. Madison, 109 N.J. 223, 232 (1988).  First, it considers whether the identification procedure was in fact unnecessarily suggestive.  Ibid.  Second, if the court finds that the procedure was suggestive, it must then evaluate whether the identification was sufficiently reliable for admission despite the suggestiveness of the procedure. Ibid.  A defendant who seeks to exclude an out-of-court identification must demonstrate by a preponderance of the evidence that the "pretrial identification was so suggestive as to result in a substantial likelihood of misidentification."  State v. Hurd, 86 N.J. 525, 548 (1981).  Credibility of the identification is not the issue when determining admissibility but rather a matter of weight ultimately for the jury to decide. State v. Farrow, 61 N.J. 434, 451 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973).  A trial court's decision to admit evidence after a Wade hearing is "entitled to very considerable weight." Ibid.

Following the Wade[fn2] hearing, the trial judge found that the out-of-court identification of defendant was not impermissibly suggestive nor could it result in "a substantial likelihood of misidentification."  Again we agree with the following observation made by the trial judge:

> [fn2] United States v. Wade, 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149, 1173 (1967).

> I should ... state at the outset that having had the opportunity to hear the testimony of both Detective Selesky and Mr. Maselli, I found both of them to be very credible.  I find no basis to in any way conclude that their testimony was either false or misleading.  And I have analyzed their testimony on that basis.

> Throughout this court's opinion, if I refer to their testimony, I again want to make it clear

19

that I found their testimony to be quite credible
and, indeed, quite consistent.

Now, based upon all of the available
information before this court, I make the
following findings of fact and conclusions of law.

....

[Detective Selesky] took descriptions from
the various witnesses.

Ultimately, during the course of the
investigation, he on numerous occasions apparently
... showed photographs of Hispanic males.  ...
[T]he record is clear that from late February of
1998 up and through until December of 1998
Detective Selesky made an attempt to have Mr.
Maselli and other witnesses identify various
suspects to no avail.  ...

Then on about December 8th of 1998 ... he
received information that the defendant and
codefendant ... were involved in the liquor store
robbery.  And as a result of that, he presented
Mr. Maselli ... with an envelope containing seven
black and white photographs of Hispanic males.
Selesky told Maselli to take his time and that the
person may or may not ... be included in the
lineup. ...

Maselli looked at the photographs ... and he
ultimately picked [the] photo that depicted the
defendant Jose Turcio.  He stated that he was 80
percent sure that the person depicted in the photo
was the individual who had the most striking
resemblance, the closest resemblance to one of the
suspects that he had described, this Hispanic male
who he had observed holding a silver handgun and
firing a silver handgun at the time of the
robbery.

Maselli stated at that time that the facial
coloring was the same, the eyes and nose were the
same, but the person didn't have a mustache and
his hair looked shorter on the date in question.

20

In any event, Maselli signed the photograph of the defendant.  Later on ... he also identified the defendant in a physical lineup sometime on or about December 21st, 1998.

Now, the defendant asserts that the photographic identification made by Maselli was ... unduly suggestive and that it was somehow the product of impermissible suggestiveness on the part of the detective.  And further, that it then tainted the subsequent identification made at the physical lineup.

The case law is clear that when an out of court identification is challenged on these grounds, the defendant bears the burden of demonstrating by a preponderance of the evidence that pretrial identification was so suggestive as to result in a substantial likelihood of misidentification.  Even if this court were to conclude that the photographic display was impermissibly suggestive, subsequent identification of the defendant might still be admissible if there is no substantial likelihood of misidentification.

In this case the defendant does not assert with any degree of specificity the grounds for arguing that the display was impermissibly suggestive.  At most, it appears that the defendant argues that the photograph of the defendant shown to Mr. Maselli had the only date of the arrest underneath the defendant's face, if you will, that was subsequent to the date of the robbery, that all of the other photographs had dates that were earlier in time.  And somehow the fact that this photo was ... the most recent of any of the potential suspects, that somehow that was impermissibly suggestive.

The court has examined the record and considered the testimony in this regard and does not find that the photographic identification was unduly suggestive or impermissibly suggestive.

First of all, the photographs shown to Mr. Maselli were all of Hispanic males approximately

21

the same age and approximately the same complexion.

It is true that they all were mug shots. ... But that, of course, is not dispositive of this issue.  Indeed, it is important to note that Maselli, by his own testimony and the testimony of Detective Selesky, by the time of this photographic identification had looked at numerous photographs of Hispanic males and did not identify anyone.

I think the ... conclusion this court draws from that fact is that Mr. Maselli was not likely to be influenced by the fact that ... a police officer was showing him photographs.  It is clear that he looked at perhaps hundreds of mug shots or photos of Hispanic males and because he didn't see anyone who he felt may have been one of the suspects, he did not make an identification.  And I think that is a very important point.

Also, the court has viewed the photographs or copies of the photographs that were shown to Mr. Maselli.  And the court finds that there was nothing unusual or striking about the defendant's photograph that would have made it stand out in any way or that by itself would have been suggestive.

Clearly the defendant's photo is the only photo with a date that comes after the date of the robbery.  But the court has considered and examined the testimony of Mr. Maselli, and the court is satisfied that Mr. Maselli didn't notice or pay any attention to the date and clearly the date on the photo did not have any significance to him or did not result in him making the identification.  I find that that fact alone, that is, the date of the photo, was not in any way suggestive of the defendant's involvement.

Nothing about the way the photographs were shown to Mr. Maselli or what was said to Mr. Maselli, or between Mr. Maselli and the detective was impermissibly suggestive.

...

22

I am satisfied that clearly Mr. Maselli made this identification based upon his own observations and not because of any suggestion by the detective.  Mr. Maselli appeared to the court as a very articulate, educated individual with a very clear recollection of what occurred and a very clear ability to reach conclusions on his own.  He did not in any way appear during his testimony to be someone who would be likely to be influenced by police conduct.

...

With respect to the lineup ... identification, I similarly find that in this case there was nothing either impermissibly suggestive about the lineup nor was there any legal flaw in the manner in which the lineup was authorized.

First of all, aside from the photographic identification, I think it's important for the court to make some assessment regarding whether the identification by photograph could have resulted in a taint of the lineup, if you will, or resulted in a substantial likelihood of misidentification at the time of the lineup.

Here again I am satisfied that Mr. Maselli was able to identify the defendant at the lineup primarily because of his observations at the time of the crime and not simply because he was the same person he had seen in the photograph.  Here again it is clear from the testimony of Mr. Maselli, and I think also from his failure to identify individuals in the past who he had been shown, that he had a very clear recollection of who he saw and a very clear view of ... his ability to identify someone, and it was not likely to be in any way influenced by the detective.

The judge further noted that the composite drawing created by the information provided by Mack and Maselli shortly after the offense bore a "remarkable resemblance to defendant."  The judge also acknowledged that whether Maselli was eighty or one hundred percent sure was a question of weight for the jury and did not establish that the identification was a product of impermissible suggestiveness.

Although defendant acknowledges that the trial
judge instructed the jury on cross-racial
identification pursuant to <u>State v. Cromedy</u>, 158 N.J.
112 (1999), he contends that the judge erred by not
making any reference to cross-racial identification at
the time he made his findings following the <u>Wade</u>
hearing.  Again defendant misses the mark.  <u>Cromedy</u>
deals with jury instructions, not with admissibility of
evidence.  furthermore, the record reveals that the
judge, in reaching his findings, was cognizant that the
witnesses were required to make a cross-racial
identification but nonetheless found them acceptable.
We are satisfied that the judge's decision could
reasonably have been reached on the evidence presented.
<u>State v. Bono</u>, 128 N.J. Super. 254, 262, <u>certif.
denied</u>, 65 N.J. 572 (1974).

(Opinion of Appellate Division, Sept. 30, 2003, at 12-18.)

Petitioner's claim of "taint" with respect to the line-up

identification, based upon the witnesses having viewed Petitioner

at a bail hearing on an unrelated matter, made in the context of

a claim of ineffective assistance of counsel, was rejected by the

trial court and the Appellate Division.

Our review of the record confirms there was no showing
that defendant's attorney was deficient for not
challenging the pretrial lineup on December 23, 1998.
However, even if defendant's attorney erred, we are
satisfied there was no prejudice to defendant's
defense.  As the trial judge noted in denying
defendant's motion to acquit, two of the liquor store
employees gave descriptions of the men in question
which were "consistent, not only with each other but
consistent with the description of the defendant in
this case"; "they were able to describe this man with a
silver revolver to an artist who did a composite
photo"; one of the employees identified defendant's
photograph from a photo array on December 8, 1998, as
someone who looked very similar to "the man with the
silver gun"; and both witnesses made positive in-court
identifications of defendant, which are not challenged
by defendant.  thus, even if we were to assume the
lineup identification was invalid, there has been no

24

> showing of prejudice because the State presented other
> reliable and compelling identification evidence to
> prove defendant was 'the man with the silver gun"
> during the shooting and robbery at Bodnar's Liquor
> Store.

State v. Turcio, 2008 WL 2952030, *5 (N.J.Super. App.Div. Aug. 4, 2008).

An accused is entitled to due process protection against the introduction of evidence of, or tainted by, unreliable identifications elicited through unnecessarily suggestive identification procedures.  See generally Manson v. Brathwaite, 432 U.S. 98 (1977) and cases cited therein.

> [R]eliability is the linchpin in determining the
> admissibility of identification testimony ... .  The
> factors to be considered ... include the opportunity of
> the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy
> of his prior description of the criminal, the level of
> certainty demonstrated at the confrontation, and the
> time between the crime and the confrontation.  Against
> these factors is to be weighed the corrupting effect of
> the suggestive identification itself.

Manson, 432 U.S. at 114 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

Thus, due process prohibits an in-court identification if pre-trial identification procedures were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377 (1968).

In addition, the Supreme Court has recognized that "improper employment of photographs by police may sometimes cause witnesses

25

to err in identifying criminals." <u>Simmons</u>, 390 U.S. at 383.  The
Court has identified certain procedures that heighten the risk of
misidentification, including such practices as displaying the
photo of only a single individual who generally resembles the
person the witness saw, showing the witness photos of several
persons among which the photograph of a single individual recurs
or is in some way emphasized, or indicating to the witness that
police have other evidence that one of the persons pictured
committed the crime.  <u>Id.</u>  Despite the risk of misidentification,
the Supreme Court has not prohibited the employment of
photographic identification methods, either in the exercise of
its supervisory power or as a matter of constitutional
requirement.  <u>Id.</u>  Instead, the Court has required that each case
must be considered on its own facts and must be evaluated in
light of the totality of surrounding circumstances; also, the
Court has noted that the risk of conviction based on photo
misidentification "may be substantially lessened by a course of
cross-examination at trial which exposes to the jury the method's
potential for error."  <u>Id.</u>

    Similarly, in <u>United States v. Wade</u>, 388 U.S. 218 (1967),
the Supreme Court held that a pre-trial line-up is a critical
stage of a prosecution at which the suspect is entitled to
counsel; where counsel is absent, the accused is entitled to a
hearing to determine whether the identification procedure was so

26

tainted that a subsequent in-court identification should be suppressed.

Where a trial court has failed to exclude identification evidence obtained in violation of a defendant's due process or Sixth Amendment rights, the habeas court must determine whether the failure to exclude that evidence was harmless constitutional error under Chapman v. California, 386 U.S. 18 (1967).  See Moore v. Illinois, 434 U.S. 220, 232 (1977).

The Court of Appeals for the Third Circuit has explained that the

> Simmons/Stovall inquiry is essentially two-pronged.
> The first question is whether the initial
> identification procedure was "unnecessarily" or
> "impermissibly" suggestive.  This inquiry actually
> contains two component parts: "that concerning the
> suggestiveness of the identification, and that
> concerning whether there was some good reason for the
> failure to resort to less suggestive procedures."  If a
> procedure is found to have been unnecessarily
> suggestive, the next question is whether the procedure
> was so "conducive to ... mistaken identification" or
> gave rise to such a "substantial likelihood of ...
> misidentification" that admitting the identification
> would be a denial of due process.

United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991) (citations omitted) (emphasis added by Third Circuit).

Here, though relying on state caselaw, the New Jersey courts correctly identified the controlling legal principles.  Their decisions were neither contrary to nor an unreasonable application of controlling federal law.  Nor were the state courts' factual determinations unreasonable in light of the

evidence presented.  Petitioner is not entitled to relief on this ground.

D.   <u>Ineffective Assistance of Counsel</u>

Petitioner contends that he did not receive constitutionally adequate trial counsel, who he alleges failed to challenge the line-up identification, failed to meet with Petitioner before trial, was drunk during trial, allowed Petitioner to be seen in handcuffs by the jury, failed to raise the issue of two female jurors sleeping, and failed to present alibi witnesses.

On direct appeal, the Appellate Division found that Petitioner's allegations respecting counsel ineffectiveness involved assertions and evidence beyond the trial record and were, thus, best addressed in an application for post-conviction relief.

The trial court denied relief in Petitioner's application for post-conviction relief, and the Appellate Division affirmed the denial of relief, relying heavily on the trial court's findings.

> Following an evidentiary hearing on February 21, 22, and March 24, 2006, the court denied defendant's PCR petition.  In its oral decision on March 29, 2006, the court concluded defendant's trial attorney, William J. McDonnell, had functioned effectively and professionally, and there was no evidence to support defendant's claim that he was deprived of the effective assistance of counsel.  Moreover, the court made detailed findings, which included the following:
>
> > Mr. Barker testified at the hearing in this matter on February 21st and at that time he talked

28

about what allegedly occurred during the lineup,
and what he said was ... the people in the lineup
were present in court at a bail motion.  And the
[c]ourt ordered a physical lineup.  The persons
who were asked to ID were behind glass and he and
Norma Ayala, the investigator, were present and
that ... witnesses were unable to positively
identify Turcio and that Barker would be a
possible witness and decided to pool the case out.

...

There was nothing that this [c]ourt could
find in the record which would be the basis for
holding that counsel was ineffective because of
Mr. Barker's statement that the people at the
lineup were not a hundred percent sure.  That was
brought up at the trial.  The jury had an
opportunity to evaluate the credibility of those
witnesses.  There's nothing that would have
changed the outcome of this case with respect to
the lineup.

The next ... issue ... [which] is the main
focus of this case, is the issue of Mr.
McDonnell's performance as an attorney because of
his alleged inability to comport himself as
effective counsel due to a problem with
alcoholism, and this was the main thrust of this
case, and this [c]ourt had the opportunity to hear
witnesses in this case assail ... Mr. McDonnell's
character in general.  ...

...

... The record, however, shows a different
story.  Mr. McDonnell continued to receive cases
after that 2001 date as a per diem attorney.  ...

...

Suffice it to be said, that Miss Ayala's
recollection that Mr. McDonnell was not attentive
to the case and that he rarely met with her, that
she had little contact with Mr. McDonnell, is not
credible at all.  I find that Miss Ayala has an
extremely bad recollection of the events of this
case.  I do not credit her testimony in any way

that Mr. McDonnell failed to meet with her or the
defendant in preparation of this case. I find
that he did so. I credit the testimony of Mr.
McDonnell in that regard.

Mr. McDonnell comported himself on the
witness stand as a person who understood the
questions, who was anxious to forthrightly answer
those questions, who was not impaired in any way,
who had a clear recollection of the case and the
specifics of the case, that he answered each
question respectfully and directly. He tried to
hide nothing. His demeanor was that of a truthful
witness. ...

Neither Mr. Barker nor Miss Ayala gave any
credible testimony upon which this [c]ourt could
find that Mr. McDonnell was impaired either during
the preparation or trial of this matter.

Indeed, I now come to Mr. Casey and Judge
DeVesa.

...

I credit both Judge DeVesa's testimony in
that regard and Mr. Casey's testimony, and I find,
as a matter of fact, that Mr. McDonnell prepared
this case as any competent, functioning,
experienced criminal attorney would do and that he
was never either impaired, under the influence of
alcohol. He never exhibited any signs of being
under the influence of alcohol either during the
preparation or trial of this case.

The court also evaluated the testimony of Alfredo
Ramirez, Melvin Delcid, and Jose Andino, the three
potential alibi witnesses.

I credit Mr. McDonnell's testimony that these
witnesses who, frankly, I'm not sure would have
added anything, had they been called, to the
testimony of the two witnesses who were called.
From what I heard from these witnesses in this
courtroom, their past testimony about specific
times of entry and leaving, I do not believe that
they would have, if called, given a different
version. And why would Mr. McDonnell have

30

prepared ... out-of-state subpoenas to subpoena these witnesses if he didn't intend to call them? [There] would have been nothing more for him to do except to have those subpoenas enforced, yet these witnesses denied that they received subpoenas.  I think these witnesses testified in a way to corroborate what Mr. McDonnell said, that they were somewhat apprehensive and fearful and that they didn't show up and he put on the witness stand those who did show up and that they testified in accordance with what their recollection was of the party.

Pursuant to the Sixth Amendment of the United States Constitution, the right to counsel is recognized as the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S.Ct. 2052, 2063-64, 80 L.Ed.2d 674, 691-92 (1984).  In Strickland, the United States Supreme Court created a two part test to determine whether a defendant received ineffective assistance of counsel.  Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.  "first, the defendant must show that the counsel's performance was deficient" by establishing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Ibid.  "Second, the defendant must [demonstrate] that the deficient performance prejudiced the defense" by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Ibid.  Under this prong, [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland test and applying it to the guarantee of effective assistance of counsel in Article I, Paragraph 10 of the New Jersey Constitution).

As stated by the Strickland Court, [j]udicial scrutiny of counsel's performance must be highly deferential" and "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Strickland, supra 466 U.S. at 688-89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.  The court will recognize a "strong presumption" that

31

counsel provided "reasonable professional assistance."
Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

In the present matter, the court concluded
defendant failed to establish both prongs of the
Strickland test, and the record fully supports those
findings.  Our review of the record confirms there was
no showing that defendant's attorney was deficient for
not challenging the pretrial lineup on December 23,
1998.  However, even if defendant's attorney erred, we
are satisfied there was no prejudice to defendant's
defense.  As the trial judge noted in denying
defendant's motion to acquit, two of the liquor store
employees gave descriptions of the men in question
which were "consistent, not only with each other but
consistent with the description of the defendant in
this case"; "they were able to describe this man with a
silver revolver to an artist who did a composite
photo"; one of the employees identified defendant's
photograph from a photo array on December 8, 1998, as
someone who looked very similar to "the man with the
silver gun"; and both witnesses made positive in-court
identifications of defendant, which are not challenged
by defendant.  thus, even if we were to assume the
lineup identification was invalid, there has been no
showing of prejudice because the State presented other
reliable and compelling identification evidence to
prove defendant was 'the man with the silver gun"
during the shooting and robbery at Bodnar's Liquor
Store.

Similarly, for the reasons stated by Judge Gelade,
we agree the outcome of defendant's trial would not
have been different if the three alibi witnesses, who
testified at the PCR hearing, had testified at
defendant's trial.  We therefore affirm substantially
for the reasons stated by Judge Gelade in his
comprehensive oral decision on March 29, 2006.

State v. Turcio, 2008 WL 2952030, *2-5 (N.J.Super. App. Div. Aug

4, 2008.

Once again, the state courts identified the controlling

federal law.  The state court decisions are neither contrary to

nor an unreasonable application of that law.  Nor are the state

court decisions unreasonable in light of the facts presented to those courts.  Petitioner is not entitled to relief on grounds of ineffective assistance of trial counsel.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition shall be denied.  An appropriate order follows.


                                        /s/ Freda L. Wolfson
                                        Freda L. Wolfson
                                        United States District Judge
Dated:  May 26, 2010

33